CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED
5/20/26

LAURA A. AUSTIN, CLERK
BY: /s/ Lauren Mihalic-Bandy
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Roanoke Division

| | | |
|---|---|---|
| NICK MATTHEW FULLER, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Case No. 7:26cv00412 |
| | ) | |
| MEDIKO, P.C., | ) | |
| | ) | |
| SUSAN BLICK, NP-C, | ) | |
| | ) | |
| JAMES FOX, RN, | ) | |
| | ) | |
| DAWN SESSOMS, RN, and | ) | |
| | ) | |
| LILIAN LE, LPN, | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiff Nick Matthew Fuller, by and through counsel, alleges as follows against Defendants Mediko, P.C.; and Susan Blick, NP-C, James Fox, RN, Dawn Sessoms, RN, and Lillian Le, LPN, for violations of Mr. Fuller's constitutional rights under the Fourteenth Amendment to the United States Constitution, and for medical malpractice and negligence under Virginia law.

## PARTIES

1.      Plaintiff Nick Matthew Fuller ("Mr. Fuller") is an adult resident of Virginia. At all times relevant to this Complaint, Mr. Fuller was in the custody of the Roanoke City Sheriff's Office and was confined at the Roanoke City Adult Detention Center, located at 324 Campbell Avenue SW, Roanoke, Virginia.

2.    Defendant Mediko, P.C. ("Mediko") is a Virginia professional corporation headquartered in Richmond, Virginia. At all relevant times, Mediko contracted with the Roanoke City Sheriff's Office to serve as the exclusive provider of medical, dental, and mental-health services to inmates at the Roanoke City Adult Detention Center. In performing this contractual function, Mediko acted under color of state law and was responsible for ensuring the constitutional adequacy of the medical care provided to Mr. Fuller and other inmates.

3.    Defendant Susan Blick, NP-C ("NP Blick") is a Nurse Practitioner licensed in the Commonwealth of Virginia who, at all relevant times, was employed by or under contract with Mediko to provide medical care to inmates at the Roanoke City Adult Detention Center. NP Blick is sued in her individual capacity.

4.    Defendant James Fox, RN ("Nurse Fox") is a Registered Nurse licensed in the Commonwealth of Virginia who, at all relevant times, was employed by or under contract with Mediko to provide nursing care, including wound assessment and wound care, to inmates at the Roanoke City Adult Detention Center. Nurse Fox is sued in his individual capacity.

5.    Defendant Dawn Sessoms, RN ("Nurse Sessoms") is a Registered Nurse licensed in the Commonwealth of Virginia who, at all relevant times, was employed by or under contract with Mediko to provide nursing care, including wound assessment and wound care, to inmates at the Roanoke City Adult Detention Center. Nurse Sessoms is sued in her individual capacity.

6.    Defendant Lilian Le, LPN ("LPN Le") is a Licensed Practical Nurse licensed in the Commonwealth of Virginia who, at all relevant times, was employed by or under contract with Mediko to provide nursing care, including wound assessment and wound care, to inmates at the Roanoke City Adult Detention Center. LPN Le is sued in her individual capacity.

2

7. At all relevant times, each of the individual Defendants was acting under color of state law and within the scope of his or her employment, agency, or contractual relationship with Mediko.

## JURISDICTION & VENUE

8. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) over Plaintiff's claims arising under 42 U.S.C. § 1983. The Court has supplemental jurisdiction over Plaintiff's pendent state-law claims pursuant to 28 U.S.C. § 1367(a).

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred at the Roanoke City Adult Detention Center in Roanoke, Virginia, which is located within this District.

10. Assignment to the Roanoke Division of the Western District of Virginia is proper because a substantial part of the acts and omissions giving rise to the Plaintiff's claims occurred in this division.

## FACTUAL ALLEGATIONS

11. On or about May 7, 2025, at approximately 6 pm, Mr. Fuller was admitted to the Roanoke City Adult Detention Center. At the time of his admission, he disclosed to Mediko medical staff that, prior to incarceration and during a period of acute psychiatric crisis, he had walked barefoot through the Roanoke River and had sustained a puncture-type wound to the underside of his right great toe.

12. A puncture wound sustained while walking barefoot through a freshwater river is a known and well-recognized vector for serious bacterial and atypical infection, including infection with Gram-negative organisms, anaerobes, and waterborne pathogens such as Aeromonas. The standard of care for such a wound requires prompt and aggressive evaluation,

3

careful daily wound assessment, escalation to a prescribing provider at the first sign of infection, and an immediate transfer to a hospital or other appropriately equipped facility if the infection cannot be definitively addressed on site.

## I.    DEFENDANTS HAD KNOWLEDGE OF MR. FULLER'S WORSENING TOE WOUND FROM THE OUTSET OF HIS INCARCERATION.

13.    On May 7, 2025, the day Mr. Fuller was booked into the Roanoke City Adult Detention Center, Defendant Nurse Fox conducted Mr. Fuller's initial nursing assessment. Nurse Fox documented the right great toe puncture wound and the mechanism of injury in Mr. Fuller's electronic medical record. From that day forward, Mediko's nursing and provider staff were on notice of the freshwater puncture wound and its associated infection risk.

14.    On May 10, 2025, Defendant Nurse Fox, personally evaluated Mr. Fuller and completed nursing-protocol assessments. Nurse Fox documented his observations in Mr. Fuller's electronic medical record, which included "R great toe cut to underside.  Mr. Fuller also complained of overall body aches. Nurse Fox knew, or in the exercise of his professional judgment as a Registered Nurse should have known, that a puncture wound from a freshwater river is at substantial risk of infection and requires escalation to a prescribing provider at the earliest sign of clinical deterioration.

15.    On May 13, 2025, Mr. Fuller went to sick call and the notes state: "big toe right foot, major abrasion, redressing daily is not preventing infection, which is spreading, toe has swollen to round the clock throbbing."

16.    NP Blick prescribed Bactrim.  No order for follow-up was made.  He was given Motin for the pain, and bandages.

4

17.    No wound care is reflected in the medical records from May 11 – May 16th.  No nurse evaluated the emerging infection or cared for the wound, at all, allowing the infection to continue to worsen.

18.    On May 16, 2025, Registered Nurse Stover was the Mediko nurse to whom the documented PM wound-care task for Mr. Fuller's right great toe was assigned. Notwithstanding that assignment and notwithstanding the wound's known mechanism of injury and risk profile, Nurse Stover took no action herself to perform the wound care during her shift, instead permitting it to be deferred to dayshift. As a Registered Nurse, she had both the professional knowledge and the institutional authority to escalate Mr. Fuller's deteriorating condition to a prescribing provider on an emergent basis. She failed to do so.

19.    In the early morning hours of May 18, 2025, at 00:32, Defendant Nurse Sessoms performed a nursing wound assessment of Mr. Fuller's right great toe. Nurse Sessoms documented in the electronic medical record that the wound was a "puncture size of an ice pick," with "red tissue protruding," and that, although she observed "no drainage noted," the toe was "swollen and can tell it needs to be drained." That note was a contemporaneous, written acknowledgment by a Registered Nurse that, in her clinical judgment, Mr. Fuller's toe required surgical drainage of infection. Notwithstanding that recognition, Nurse Sessoms cleaned and bandaged the wound, applied bacitracin ointment, and did not arrange for Mr. Fuller to be seen by a prescribing provider on an emergent basis or transferred to a facility capable of performing the drainage that, by her own clinical assessment, the toe "need[ed]."

20.    Later that same day, May 18, 2025, at approximately 17:00, Defendant LPN Le performed a further wound assessment of Mr. Fuller's right great toe. LPN Le documented the wound, cleansed it with Hibiclens, applied Bactroban ointment, and dressed it. LPN Le also

5

completed a body-aches nursing protocol form for Mr. Fuller approximately one minute later, at 17:01, contemporaneously documenting infection and drainage to the right great toe. By that date, two licensed members of Mediko's nursing staff had assessed the wound on the same calendar day, both had documented findings consistent with the need for surgical drainage, and yet neither arranged for transfer to an outside provider.

21.    On May 19, 2025, Defendant NP Blick saw Mr. Fuller for a chronic-care visit, at which time he had a low grade fever. NP Blick noted the right great toe infection and prescribed Augmentin, another oral antibiotic. NP Blick did not arrange for transfer of Mr. Fuller to an emergency department or any other facility capable of performing the surgical drainage that an infected puncture wound foreseeably requires.

22.    On May 19, 2025, at approximately 20:54, Defendant Nurse Fox performed another nursing wound assessment of Mr. Fuller's right great toe. Nurse Fox documented his findings, cleansed the wound with Hibiclens, applied Bactroban, and applied a dry dressing. Notwithstanding that, by his own observations, the wound was now under provider treatment with antibiotics and yet was failing to resolve, Nurse Fox did not immediately escalate Mr. Fuller for emergent outside transfer or insist that NP Blick reconsult the patient on an emergent basis.

23.    On May 20, 2025, at approximately 19:16, Defendant Nurse Fox performed yet another wound assessment of Mr. Fuller's right great toe. The wound at this time was, by every clinical metric, worsening. Nurse Fox again failed to escalate Mr. Fuller's deteriorating condition to a prescribing provider on an emergent basis or to insist on outside transfer.

24.    Each of the foregoing encounters and medication administrations was documented in Mr. Fuller's electronic medical record maintained by Mediko. Each Defendant who encountered Mr. Fuller during this period knew or had ready access to the chronology of his wound, the

6

mechanism of injury, the prior assessments of his or her colleagues, and the ongoing failure of conservative therapy. The cumulative chart was a continuing, contemporaneous record of a badly deteriorating clinical situation.

25.    Despite the cumulative knowledge available to each Defendant, no Defendant ensured that Mr. Fuller was transferred to a hospital or other appropriately equipped outside provider while the infection remained at a stage at which it could be definitively addressed without amputation.

## II.    NP BLICK ATTEMPTED TO TREAT MR. FULLER'S INFECTED TOE AT THE JAIL DESPITE HAVING NO STERILE EQUIPMENT.

26.    On May 19, 2025, Mr. Fuller returned to NP Blick for follow-up of the right great toe infection. On objective examination that day, NP Blick documented that Mr. Fuller's right great toe was "moderately edematous and erythematous with purulent drainage present." In plain language, the toe was visibly swollen, visibly red, and actively oozing pus. The toe was, by NP Blick's own examination findings, obviously infected.

27.    By her own late note, NP Blick recognized that the appropriate intervention for Mr. Fuller's infected toe was an incision and drainage ("I&D") procedure to evacuate the purulent material from within the soft tissue of the toe.

28.    An I&D is a sterile surgical procedure. It cannot lawfully or safely be performed without sterile instruments, sterile gloves, sterile drapes, sterile irrigation, sterile dressings, and an environment in which the operative field can be prepared and maintained in a sterile state. Performing an I&D without sterile supplies risks introducing additional pathogens into the wound, exacerbating the infection, and causing systemic illness, deeper tissue infection, osteomyelitis, sepsis, and amputation.

7

29.     By NP Blick's own admission documented in the medical record, the Roanoke City Adult Detention Center had no sterile supplies with which to perform the I&D that Mr. Fuller's toe required. NP Blick wrote in her note: "An I&D was not performed secondary to no sterile supplies. Appropriate supplies were ordered and have not arrived."

30.     Faced with a patient whose toe required an immediate surgical intervention that she could not perform safely on site, the standard of care required NP Blick to do one thing: send Mr. Fuller out to a hospital or other facility where the I&D could be performed under sterile conditions, and to do so on an emergent basis.

## III.    DEFENDANTS' FAILURE TO PROVIDE OR ARRANGE TIMELY DEFINITIVE CARE COST MR. FULLER HIS TOE.

31.     On May 21, 2025, Mr. Fuller was finally transported to Carilion Roanoke Memorial Hospital. By that point, the infection had progressed beyond what could be addressed by simple incision and drainage. The treating surgeons at Carilion Roanoke Memorial Hospital determined it was necessary to amputate Mr. Fuller's right great toe.

32.     On May 28, 2025, Mr. Fuller returned to NP Blick at the Roanoke City Adult Detention Center for post-operative follow-up after his right great toe had been removed at Carilion Clinic.

33.     Mr. Fuller's amputation was preventable. Had Nurse Fox, NP Blick, Nurse Sessoms, or LPN Le escalated Mr. Fuller's deteriorating wound to a prescribing provider in a timely fashion during the days leading up to May 21, 2025, amputation, the infection could have been arrested before it required surgical drainage at all. Had NP Blick transferred Mr. Fuller to an outside hospital on May 19, 2025 when she had no sterile equipment with which to perform the I&D she herself recognized was indicated, the infection could have been definitively drained while the toe was still salvageable. Each Defendant possessed the knowledge, the authority, and the opportunity to prevent the loss of Mr. Fuller's toe. Each Defendant failed to do so.

8

34.    As a direct and proximate result of Defendants' conduct, Mr. Fuller has suffered the permanent amputation of his right great toe, severe physical pain, mental anguish, fear, the indignity of disability while incarcerated, permanent functional impairment of gait and balance, ongoing wound care needs, and the lifelong consequences of partial-foot amputation, including but not limited to altered biomechanics, increased risk of falls, and reduced mobility.

## CONSTITUTIONAL CAUSES OF ACTION
### Count I
### Deliberate Indifference to a Serious Medical Need in Violation of the Fourteenth Amendment
### 42 U.S.C. § 1983 — Against the Individual Defendants

35.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

36.    At all relevant times, each of the individual Defendants NP Blick, Nurse Fox, Nurse Sessoms, LPN Le, LPN Kline, Nurse Akers, Nurse Stover, and LPN Alexander, acted under color of state law in the provision of correctional medical care to Mr. Fuller.

37.    Mr. Fuller's right great toe infection was an objectively serious medical need. The wound had been diagnosed by a medical professional as requiring treatment, was actively producing purulent drainage by May 19, 2025, and was of a kind that the failure to treat would foreseeably and predictably result in further significant injury, including amputation.

38.    Each of the individual Defendants subjectively knew of and disregarded an excessive risk to Mr. Fuller's health. Each Defendant knew Mr. Fuller had a freshwater puncture wound to his right great toe that had not healed and was being followed in the jail clinic. Each Defendant knew, by virtue of his or her professional training, that such a wound carries a serious risk of infection. Each Defendant had access to Mr. Fuller's contemporaneous medical record, which documented the worsening progression of the wound.

39.    At all relevant times, Plaintiff was a pre-trial detainee.

9

40.    Notwithstanding that knowledge, each Defendant disregarded the substantial and obvious risk by, among other failures: failing to escalate Mr. Fuller's deteriorating condition to a prescribing provider; failing to insist on emergent transfer to a hospital; and, in the case of NP Blick, attempting to manage with oral antibiotics a frankly purulent wound that, by her own examination findings and her own assessment, required surgical drainage that she was unable to perform on site for lack of sterile equipment.

41.    NP Blick's decision no to emergently transfer Mr. Fuller on May 19, 2025, when she knew she could not perform the indicated I&D and knew Mr. Fuller's toe had active purulent drainage, was deliberately indifferent to the substantial risk of further injury, including amputation.

42.    Nurse Sessoms's deliberate indifference is particularly stark. By her own contemporaneous documentation, she observed at 00:32 on May 18, 2025 that Mr. Fuller's toe was "swollen and can tell it needs to be drained." Having recorded in writing that the toe needed to be drained, she did nothing to ensure that Mr. Fuller would be drained — not by escalating to a provider, not by arranging emergency transfer, not by even noting in the chart that immediate provider review was required.

43.    As a direct and proximate result of the individual Defendants' deliberate indifference, Mr. Fuller suffered the amputation of his right great toe and the further damages described herein.

## STATE-LAW CAUSES OF ACTION
### Count II
**Medical Malpractice Against NP Blick, Nurse Fox, Nurse Sessoms, LPN Le, and Mediko, P.C.**

44.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

10

45.    Each of NP Blick, Nurse Fox, Nurse Sessoms, LPN Le, and LPN Kline, is a "health care provider" within the meaning of Virginia Code § 8.01-581.1, and each owed Mr. Fuller a duty to exercise the degree of skill and diligence employed by a reasonably prudent health care provider in his or her respective field practicing in Virginia under like circumstances.

46.    Each of these Defendants breached the applicable standard of care, including but not limited to: (a) failing to recognize and respond to the obvious progression of an infected freshwater puncture wound; (b) failing to escalate Mr. Fuller's wound to a prescribing provider in a timely manner; (c) failing to timely arrange for emergent transfer to an appropriately equipped outside facility when on-site treatment was not feasible; and (d) in the case of NP Blick, attempting to manage with oral antibiotics, and classifying as "non-emergency," a frankly purulent wound that on her own examination required immediate surgical drainage that she could not perform on site.

47.    Specifically with respect to Nurse Sessoms, the applicable nursing standard of care required her, having concluded in her own non-contemporaneous note that Mr. Fuller's toe was "swollen and can tell it needs to be drained," to take immediate action to ensure that the drainage would in fact occur by emergent provider notification and, if necessary, outside transfer. Her failure to do so fell below the applicable standard of care.

48.    Specifically with respect to NP Blick, the applicable nurse-practitioner standard of care required her, having concluded in her own two-day late note on May 21, 2025, reflecting her May 19, 2025 visit, that an I&D was indicated and could not be performed on site for lack of sterile supplies, to immediately arrange emergent outside transfer. Her failure to do so fell below the applicable standard of care.

11

49.    As a direct and proximate result of these breaches, Mr. Fuller lost his right great toe and suffered the further damages described herein.

50.    Mediko is vicariously liable for the negligent acts and omissions of its employees and agents within the scope of their employment or agency.

51.    Plaintiff has complied, or will comply prior to service, with the certification requirements of Virginia Code § 8.01-20.1.

## DAMAGES

52.    As a direct and proximate result of Defendants' conduct, Mr. Fuller has suffered, and will continue to suffer, the following damages: the permanent loss of his right great toe; severe physical pain and mental suffering; humiliation; permanent disfigurement; permanent functional impairment of gait, balance, and ambulation; an increased lifetime risk of falls, ulceration, and further amputation; ongoing and future medical and wound-care expenses; lost earnings and lost earning capacity; and other consequential damages to be proven at trial.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Nick Matthew Fuller respectfully requests that this Court enter judgment in his favor and against Defendants, jointly and severally where appropriate, as follows:

A.    Compensatory damages in an amount to be determined at trial for the violation of Mr. Fuller's constitutional rights under the Fourteenth Amendment;

B.    Compensatory damages in an amount to be determined at trial for medical malpractice and negligence under Virginia law;

12

C.      Punitive damages in an amount sufficient to punish Defendants for their conduct under

§ 1983 and to deter similar conduct in the future;

D.      Pre-judgment and post-judgment interest as allowed by law;

E.      Reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 and other applicable

law; and

F.      Such other and further relief as the Court deems just and proper.

**A JURY TRIAL IS DEMANDED.**

Respectfully Submitted,

NICK MATTHEW FULLER

By:      /s/

Jonathan E. Halperin (VSB No. 32698)
Andrew Lucchetti (VSB No. 86631)
Halperin Law Center, LLC
4435 Waterfront Drive, Suite 100
Glen Allen, VA 23060
(804) 527-0100
(804) 597-0209 facsimile
jonathan@hlc.law
andrew@hlc.law
*Counsel for Plaintiff*